UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CASE NO.: 1:20-CR-77-HAB |
| | ) |
| HENRY E. UNDERWOOD | ) |

**OPINION AND ORDER**

"There are two ways to be fooled. One is to believe what isn't true; the other is to refuse to believe what is true."

― Soren Kierkegaard

Henry E. Underwood ("Underwood") has been fooled by the truth. After pleading guilty to aiding and abetting the attempted killing of a federal witness, he disavows what the evidence overwhelmingly shows is the truth – his motivation to commit the crime was good old-fashioned cash. Now before the Court is Underwood's objection to a four-level enhancement under U.S.S.G. §2A2.1(b)(2) recommended by the probation officer because the offense "involved the offer or receipt of anything of pecuniary value for undertaking the murder." (Presentence Investigation Report, "PSR", ECF No. 211). The Court conducted an evidentiary hearing on the objection. (ECF No. 223, Evid. Hr'g Tr. at 233). During that hearing, Underwood provided testimony that the Government argues warrants a finding that he obstructed justice which, in turn, it argues eliminates the acceptance of responsibility reduction. These issues have been fully briefed. (ECF Nos. 235, 237, 238 and 251). For the following reasons, the objection to the §2A2.1(b)(2) enhancement is OVERRULED. The Government's request to apply a two-level obstruction of justice enhancement and deny the Defendant an acceptance of responsibility reduction is GRANTED.

**DISCUSSION**

With the reality of trial looming and the jury assembled, Underwood waived his right to trial and signed a previously offered plea agreement.[1] Based on that agreement, he pleaded guilty to Count 2 of a six-count Superseding Indictment charging him with the attempted murder of a federal witness in violation of 18 U.S.C. §§1512(a)(1)(A) and (a)(1)(C) in exchange for dismissal of the remaining counts and a low-end recommendation. (ECF No. 183). Sparing the reader all the violent and gruesome details, Underwood admitted shooting the victim in the head, arm, and chest resulting in life-threatening injuries to her. (PSR ¶¶ 18-20, Guilty Plea Tr., ECF No. 234 at 29). Relying on this conduct, the probation officer assessed Underwood a base offense level of 33 because the object of the offense would have constituted first degree murder. *See* U.S.S.G. §2A2.1(a)(1), PSR ¶ 38. The officer then increased that offense level by 4 levels because the victim sustained permanent or life-threatening bodily injury, U.S.S.G. § 2A2.1(b)(1)(A) and an additional 4 levels because the offense involved the offer or receipt of money for undertaking the murder. U.S.S.G. § 2A2.1(b)(2). The probation officer then applied a 2-level decrease for acceptance of responsibility, *see* U.S.S.G. §3E1.1(a), PSR ¶¶ 39-46. All this yielded a total offense level of 39. With Underwood's criminal history category of V, he faces a guidelines range of 360 months to life with a statutory maximum term of thirty years imprisonment.

As noted, the Defendant's objection relates to the four-level enhancement under U.S.S.G. § 2A2.1(b)(2) that he believes is unsupported by the evidentiary record. After a review of the facts in the PSR and the testimony elicited at the evidentiary hearing, the Court will address the parties' arguments.

    A.    **Facts**

---

[1] Underwood made this decision after hearing the Government's record of prior plea offers required under *Martin v. United States,* 789 F.3d 703, 707 (7th Cir. 2015). (Guilty Plea Tr. at 2-9).

1.    **Background Facts Involving Underwood's Co-Defendant[2]**

In late 2017 and early 2018, the FBI's Fort Wayne Safe Streets Gang Task Force ("the Task Force") began an investigation into certain drug and violent crimes. Wiretap investigations revealed Tyshon Powell, ("Powell")[3], a known drug trafficker and Mafia street gang member, was operating a drug stash house out of a Brooklyn Avenue apartment rented by Underwood's victim.[4] (Hr'g Tr. at 51-53). In March 2018, the FBI raided the stash house and found evidence connecting Powell to the stash house as well as evidence of drug trafficking and firearms. At this time, the Task Force interviewed the victim, who implicated Powell as the individual that paid her to rent the house for him. She provided additional information including that Powell was the only individual that had access to the house, he drove a white Camaro and he sometimes borrowed her car. These details confirmed investigative facts agents had obtained through their surveillance.

Although the Task Force raided the stash house, Powell was not immediately arrested as the investigation was still ongoing. But after the stash house raid, Powell became concerned that the victim had snitched on him or would do so and attempted to bribe her with $10,000 to keep her quiet. The victim refused the bribe so Powell turned to fellow Mafia gang member Timothy Coats ("Coats"), discussing whether he should have the victim killed to prevent her from cooperating with law enforcement. (PSR, ¶ 23). Nothing came of these discussions at that time.

---

[2] Some of the information in this section are undisputed facts from the PSR. The Court will also reference the hearing testimony of Task Force Officer Adalberto Martinez ("TFO Martinez") where relevant.

[3] Powell was also charged in this case and pleaded guilty to Count 2 of the Superseding Indictment, charging him with aiding and abetting the attempted killing of a federal witness, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 1512(a)(1)(C) and 18 U.S.C. § 2. (ECF Nos. 109, 113)

[4] To afford the victim of Underwood's offense some semblance of privacy, the Court will refer to her only as "the victim" rather than by her legal name.

On May 23, 2018, Powell was indicted on federal charges associated with the stash house. Agents obtained a search warrant for a residence on Cass Street to make entry and arrest Powell. Agents subsequently served the warrant and arrested Powell on May 31, 2018. (PSR, ¶14).

Once at the Allen County Jail, Powell hatched the plan to murder the victim. He made multiple recorded telephone calls from the jail to a female and asked her to pass his instructions on to "Breeze," Coats' known nickname. (Hr'g Tr. at 51). Powell told the woman to tell Coats that the police got him for the stash house and Coats needed to fix the problem.

Later that evening Powell talked to the woman again. She had contacted Coats on Snapchat and referred to him cryptically during the jail call as "the mechanic." She told Powell that the mechanic needed the money up front to fix the engine. (Hr'g Tr. at 53-54). Powell told her that Michael Morgan, nicknamed "One Eye," would give Coats the money to fix it. Based on their previous conversations, Coats understood the request to "fix the problem" to mean killing the victim.

In a third call, Powell told the woman that Coats needed to fix it "as soon as possible, ASAP." (PSR, ¶¶s 16, 17). All of these coded references to the "mechanic" and "fixing the problem" were believed by agents to be code words for killing the victim. (Hr'g Tr. at 52). Coats did not want to be the one to murder the victim. But time was of the essence so he recruited Underwood, whom he had previously met in prison and knew to be violent enough to do the job.

On June 1, 2018, a 911 call was made by the victim's mother to send police to her daughter's residence on Oliver Street. When police arrived, they found the victim covered in blood with open wounds on her arm, chest, and head. She was incoherent. Police heard the victim's young child crying and located him with blood on him, but he was not injured. The victim sustained severe life-threatening injuries, was hospitalized, and underwent surgery.

Because of the victim's injuries, she was unable to provide an immediate interview to agents. Agents interviewed the victim's family members and learned that the victim had a cookout at her residence on May 31. These witnesses stated that a hot conversation topic at the cookout was Powell's arrest, as the victim and her family had known Powell for a long time. Eventually, the victim provided an interview in which she stated that in the early morning hours after the cookout ended, she heard a knock at the door. The man at the door, later identified by her as Underwood, was asking for someone she knew nicknamed Sheist. After she told Underwood that Sheist was not there, he pushed the door open, and shot her in the stomach. Underwood then shot her two more times hitting her in the arms, hands, chest, and head.

Powell and Underwood were indicted on the present charges on December 16, 2020 (ECF No. 1). Underwood was arrested on January 4, 2021.

## 2. Cooperating Witnesses and the Government's Evidence

Coats eventually became a cooperating witness for the Government and was released on conditions pending his cooperation and sentencing on his own unrelated federal case. Although he provided a proffer, Coats was murdered on February 27, 2023, before his cooperation was complete. (PSR, ¶22). However, as events developed, another cooperating witness came forward and proffered information about Underwood's involvement in the shooting. The Government produced this witness, Brittany Sierra ("Sierra"), at the evidentiary hearing.

Sierra was arrested in early 2023 on an unrelated drug case.[5] Sierra had information related to Underwood's conduct in 2018 and agreed to cooperate with the government and testify truthfully in exchange for a sentencing benefit. Sierra testified that she knew Underwood because

---

[5] Sierra was charged in the Northern District of Indiana cause number 1:23-cr-29, with possession with intent to distribute fentanyl and maintaining a drug involved premises. She has pleaded guilty and is awaiting sentencing.

5

he was a friend of her then-boyfriend Cameron Murdock ("Murdock"). In the late evening of May 31, 2018, Underwood asked Sierra and Murdock to pick him up at a residence on Winter Street and take him to meet "Breeze" at Southgate Shopping Center. (Hr'g Tr. at 9-11, 31). Sierra and Murdock left Sierra's mom's house on Evans Street ("Evans Street house") to pick up Underwood. (Hr'g Tr. at 31). Once at Southgate, Sierra observed Underwood get into a black car with dark window tint. Although Sierra could not see into the car because of the window tint, Underwood had said he was meeting with "Breeze," whom she knew to be Coats. (*Id.* at 11-13, 33). After a few minutes, Underwood returned to the front passenger seat of Sierra's car with a wad of cash in his hand and a gun on his hip. (*Id.* at 12-15, 34-35). Sierra described the gun to be black with a long clip or magazine which was consistent with the black, semi-automatic pistol with an extended magazine that was the attempted murder weapon.[6] (Gov't Ex. 9, Hr'g Tr. at 56-57). Underwood put the cash in his pocket. Sierra and Murdock dropped Underwood back off at Winter Street and planned to return to the Evans Street house.

The car Sierra was driving that night was a rented blue Nissan Altima with a push start. (Hr'g Tr. at 16). On the way to the Evans Street house, Sierra and Murdock had an argument and Murdock took the key to Sierra's rental car. When they got to the Evans Street house, the argument continued and Sierra's mom called the police. Murdock, who had a warrant, took off from the house with the key. Sierra also left because she had a warrant.[7] Later, Sierra called Underwood for help retrieving the key from Murdock because she believed Murdock would go to the Winter Street

---

[6] A ballistics match of the firearm in Gov't Ex. 9 confirmed that this was the firearm that was used in the shooting of the victim. That firearm was retrieved during a traffic stop of Underwood and others in July, 2018 – a case that resulted in separate federal charges against Underwood in 1:20-CR-33. (Hr'g Tr. 80-81). This Court is well-versed on the facts of that case as it proceeded to trial and Underwood was convicted.

[7] Sierra drove off in the rental car despite not having the key. She testified she had left the car running and so she was still able to drive it even without the key.

house where they had dropped off Underwood. Underwood agreed to get the key and he told Sierra to "watch the news tomorrow morning." (Hr'g Tr. at 17).

Although the details were not fleshed out at the hearing, apparently, Sierra got the key back and made up with Murdock because the next morning Sierra picked up Underwood and Murdock at the Winter Street house. (*Id.* at 18). As they were driving around, Underwood said that "they" went to a woman's house to get rid of her because she was a witness. (*Id.*). Sierra testified that "they" referred to Underwood, Murdock, and Coats, although Murdock and Coats allegedly remained in the car. (*Id.* at 27). Underwood explained that he went to the back door pretending to be someone else that the victim knew. When the victim opened the door, Underwood shot her. (*Id.* at 19). Underwood said he was supposed to get half the money before the shooting and the remainder afterwards. Sierra testified that Underwood was frustrated that he did not receive the second half of the money he was promised because the victim survived. (Hr'g Tr. at 27).

The Government admitted in evidence a Snapchat video Underwood sent to Sierra on June 1, 2018, at 7:37pm. (Gov't Exs. 1 and 2, Hr'g Tr. at 22). On that video, Underwood can be seen with a handful of cash, all large bills.

In preparation for court proceedings in another case, TFO Martinez interviewed Underwood's sister and Martin Bates ("Bates"), the owner of the Ride and Drive car lot. Underwood's sister told him that on June 1, 2018, she placed a Dodge truck purchased by Underwood in her name. Underwood did not have a driver's license so he could not have the truck in his name. (Hr'g Tr. at 59-61). Bates told TFO Martinez that Coats sold cars and when he saw a car on Bates' car lot that he liked, Coats would advertise the car and make his own profit selling it. (Hr'g Tr. at 62). He also confirmed that the seller of the vehicle does not have to appear in

7

person at the BMV. In his testimony, Underwood admitted buying the truck from Coats and giving his sister the money to do it.

The Government introduced certified BMV records to corroborate these details. Shortly after she registered the truck in her name, Underwood's sister transferred the truck to another individual. TFO Martinez testified that criminals often drive vehicles registered in other's names to avoid detection if an officer runs the plate. (Hr'g Tr. at 63). Underwood's sister also told TFO Martinez that she saw a social media post with Underwood and the truck. During his investigation, TFO Martinez located a Facebook photo showing Underwood with the Dodge Truck. (Gov't Exs. 3 and 4). The Government admitted additional corroborative exhibits at the hearing including the police report from May 31, 2018, filed by Sierra's mother. (Gov't Ex. 7, 11).

TFO Martinez testified that phone records obtained during the investigation revealed a spike in phone activity between Coats and Underwood on May 31 and June 1, 2018.

### 3. Underwood's Testimony

Underwood took the stand to provide testimony relating to the objection. To the extent Underwood answered the questions he was asked, he testified that he did not call Sierra on May 31, 2018, he did not ask her for a ride, he was not with Sierra and Murdock at all that night, he did not go to Southgate, he did not meet with Coats, Coats did not give him any money, and he didn't "need nobody to give him a gun." (Hr'g Tr. 91-94). Despite these denials, Underwood admitted knowing Coats, but denied meeting him in prison. Although he was unemployed, he also admitted giving his sister $1,500 to purchase the Dodge truck but couldn't recall when that occurred. (Hr'g Tr. at 88, 101).

On cross-examination, Underwood repeatedly refused to answer questions, provided evasive answers, and, in lay man's terms, played dumb. He testified that he did not know the victim

and no one told him to go to her house and kill her. The below excerpts are representative of the nonsense this Court and Government counsel endured while he was on the stand:

> Q. So who was the go between on the hit for [the victim]?
> A. You say what was the what?
> Q. Who was the go between? Who contacted you about killing [the victim]?
> A. Nobody never contacted me about killing nobody.
> Q. What was the last thing you said?
> A. Nobody never contacted me.
> Q. Nobody contacted you at all?
> A. I never was. None of that never happened.
> Q. So how did you decide to kill [the victim]?
> A. Kind of like a long story. I rather not get into it because –
> Q. I'm asking you to get into it. Why did you kill [the victim]?
> A. I didn't kill her.
> Q. Why did you attempt to kill her?
> A. Unrelated incident.
> Q. What incident?
> A. I rather not talk about it. That's what I'm saying.
> Q. I'm asking you to talk about it. Why did you attempt to kill [the victim]?
> A. I plead the Fifth.

Hr'g Tr. at 101-102. After the Court reminded him that he had already pleaded guilty to the attempted murder of a federal witness and the Government could ask him questions about what he did, Underwood continued his evasive tactics:

> THE WITNESS: I answered the question. I said –
> THE COURT: No, you didn't answer the question. You pled the Fifth. I'm directing you to answer the question.
> THE WITNESS: No, I said unrelated incident, unrelated reason.
> THE COURT: Okay. And he's asking you to elaborate upon the unrelated incident, and I am directing you to answer his question.
> THE WITNESS: Well, okay. Well, basically, something happened to one of my homies and that's how everything -- what caused me to go to the house.

[Gov't continued questioning the witness]

> Q. I don't understand what you're saying. Some problem with one of your homies?
> A. Yeah, with one of my friends. That probably what you understand probably better, one of my friends.

9

> Q. Who was the friend?
> A. My Uncle Kameel…
> Q. …Who are you talking about, Kameel Holley?
> A. Yes.
> Q. What was Kameel Holley's problem with [the victim]?
> A. It wasn't no problem. Something happened.
> Q. What happened?
> A. That's what I'm saying. That's why I don't want to get into it. I don't do no police stuff. Like I don't criminate other people, you know, and I don't like getting into some details that it can lead details to something else, and I rather not do that. That's why I say I don't want to answer that question.

(Hr'g Tr. 103-104).

> Q. …As far as the shooting is concerned, then, on May 31st of 2018, how did you know what house to go to?
> A. I know.
> Q. How?
> A. I just knew through –
> Q. You just knew. How did you know?
> A. Yeah. You say how did I know?
> Q. Yeah.
> A. The house?
> Q. Yeah.
> A. Easily, like I could have rolled past anything and seen somebody outside, ain't no telling.
> Q. You didn't know [the victim] before this, right?
> A. I didn't know her, no, sir
> Q. I'm confused by your answer. So nobody told you to go over to the house?
> A. No, nobody never told me to go to the house.
> Q. So you just went to the house because you were driving by?
> A. I mean, I tell you I went to the house. It was an unrelated incident. That's all. I never told you what. But that's all I told you. I never said nothing about nobody told me, nobody tell me nothing

(Hr'g Tr. at 112-113). When Underwood was asked how he got to the victim's house, he responded, "I drove" but he could not "even remember what type of car it was, for real." (Hr'g Tr. at 113). He later said he was driving his ex-girlfriend's car, a Nissan. (*Id.* at 113-114).

    **B.    Analysis**

        **1.  The 2A2.1(b)(2) Enhancement**

As set forth at the outset, Underwood's advisory guidelines range flows from a total offense level of 39 and a criminal history category of V. As it stands, he is looking at an advisory guidelines sentence of 360 months to life imprisonment with a statutory maximum of 30 years. It is simple, then, to see why Underwood is challenging the §2A2.1(b)(2) enhancement. Without that enhancement, his guidelines sentence with an offense level of 35 and a criminal history category of V would be 262-327 months with the same statutory maximum. Mindful that this is a significant difference in the advisory guidelines range, the Court takes seriously its task of correctly determining the advisory guidelines range.

The probation officer determined that a four-level enhancement under §2A2.1(b)(2) applied because the motive for the attempted murder was the payment of money. The enhancement applies if "the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder." § 2A2.1(b)(2). The enhancement is intended to cover cases in which the offense was committed for hire. Both the Government and Underwood agree that the determination of whether the enhancement applies is determined by this Court's factual determinations on whether the attempted murder of the victim involved the receipt of money. And, for this reason, this is a situation where credibility matters.

Underwood did himself no favors by testifying at the hearing. No evidence before this Court remotely suggests that Underwood's version of the events motivating his shooting of the victim– even if the Court could discern what that version is – is plausible. There was little to nothing credible about Underwood's testimony. The Court cannot over-emphasize Underwood's obstructive demeanor when he took the stand, and his subsequent testimony was so lacking in any indicia of truthfulness that it bordered on preposterous. The Court is unable to discern from Underwood's testimony exactly what he claims his motive would have been to attempt to murder

11

a woman he did not know if not monetary. And because he refused to tell the Court any details for the Court to make that determination, the only sensical conclusion from all the evidence is that he did it for the money he denied receiving. As the above excerpts represent, Underwood was evasive and seemed to be more motivated by protecting others and "not doing police work" than by providing truthful testimony. His testimony was so lacking in truth, factual detail, and corroboration that the Court gives it no weight at all.

Contrasting Underwood's testimony and demeanor with that of Sierra leads this Court to the swift conclusion that Sierra's testimony was both plausible and truthful. "[I]t is always permissible for a judge, acting in h[er] capacity as a factfinder, to use h[er] knowledge and experience to assess the credibility of witnesses and to evaluate the evidence." *United States v. Teixeira*, 62 F.4th 10, 19 (1st Cir. 2023). Not only does the Court's knowledge and experience assessing the credibility of witnesses lead to the conclusion that Sierra's testimony was credible, but commonsense, the evidence, and logic confirm it.

Sierra's testimony was heavily corroborated and consistent with the logical motive for Underwood's actions especially with Underwood's representation that he did not know the victim. What other motive makes sense given the events that had transpired? Sierra testified she remembered the date of the events because it was the same date that her mother filed a police report, May 31. 2018 – a copy of which was admitted at the hearing. She testified that she took Underwood to meet Breeze (Coats) and after meeting with him for a few minutes, he returned to the car with a wad of cash and a firearm that she later described to investigators. She also provided the Snapchat video on her phone of Underwood flashing money the same day as the attempted murder. Considering that Underwood was unemployed at the time and was waving around large bills on social media on the same day of the shooting, logic suggests the two events are related.

Perhaps most incriminating for Underwood, Sierra connects Breeze (Coats) to Underwood, the money, and the gun – facts she would not have known to connect but for the events she recalled during her testimony.

When Sierra's testimony is considered in tandem with the Government's evidence of the jail calls and the Dodge truck purchase on June 1, 2018, there is more than sufficient evidence for the Court to find that the offense involved the receipt of something of pecuniary value for the attempted killing. The Court finds that the probation officer did not err in assessing the enhancement and the objection is OVERRULED.

### 2. Obstruction of Justice and Denial of Acceptance of Responsibility

Section 3E1.1(a) of the Sentencing Guidelines allows a district court to grant a two-level reduction in a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The probation officer applied this two-level reduction based on Underwood's guilty plea. As the Court noted above, Underwood did himself no favors at the sentencing hearing. Now, because of Underwood's conduct at the hearing, the Government is seeking a two-level enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, and the removal of any reduction for acceptance of responsibility – both of which the Court find to be appropriate.

Although a guilty plea before trial is "significant evidence of acceptance of responsibility," U.S.S.G. § 3E1.1 n. 3, it does not create an entitlement to it. Where a court finds an obstruction-of-justice enhancement is warranted, the enhancement "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." *Id.* § 3E1.1 n. 4. It is only in "extraordinary cases" that a defendant may receive an enhancement for obstruction of justice and

also receive a reduction for acceptance of responsibility. *Id.* The Government seeks the obstruction of justice enhancement based on Underwood's perjurious testimony at the sentencing hearing.

There is no doubt that Underwood attempted to minimize his conduct during his testimony at the hearing. On multiple occasions, he told the Government that although he admitted to shooting the victim, his attorney told him that to plead guilty to the offense he had to admit that he did it to prevent her testimony. He suggested repeatedly that he only admitted to doing it to "prevent testimony" because that was the only way he'd get a plea deal:

> Q. One other quick thing. You pled guilty in this offense to attempting to kill a witness in order to stop her from testifying?
> A. Yes.
> Q. Right?
> A. Because I told [my lawyer], I want to plead out to [] attempted murder. But he said the only way I could get a plea if I plea out to that so I just -- he told me to say prevent testimony. That's the only reason I said that. And I told [my lawyer], I said, I really don't want to do that. I can just plead out to attempted murder, but he told me in order for something to do with the Feds to be able to pick it up and for me to get a plea. And I wasn't trying to go to trial, because I know I shot her, you know, so I'm like I'll just plead guilty to attempted murder, though. But he told me I had to say prevent testimony in order for me to take -- to be able to take a plea, he said, instead of having to go to trial.

(Hr'g Tr. at 127). The problem for Underwood is that his statements made under oath during a plea hearing are presumed true. *See Hurlow v. United States*, 726 F.3d 958, 968 (7th Cir. 2013) ("[R]epresentations made to a court during a plea colloquy are presumed to be true."). So, if he is now saying he did not shoot the victim to prevent her testimony, he either lied at the plea hearing when he said he did, or he lied at the sentencing hearing.

But that is not the only lie he told. As the Court detailed above, Underwood told a tall tale during his testimony that lacked corroboration, logic, and commonsense. The Court has both the authority and the evidentiary basis to find that Underwood willfully obstructed or impeded the administration of justice with respect to his sentencing under U.S.S.G. §3C1.1 and to deny the

acceptance of responsibility reduction. *United States v. Seidling*, 737 F.3d 1155, 1162 (7th Cir. 2013) ("The district court judge who makes sentencing determinations is due great deference because he or she is in a unique position to evaluate a defendant's words and demeanor in order to determine his acceptance of responsibility."). Indeed, the Court sympathizes with the Government's position that Underwood's conduct has obstructed the proceedings and created additional work for the Government and the Court. The Court also generally agrees that a defendant should not benefit from his own obstructive conduct by receiving an acceptance of responsibility reduction when he has chosen a path opposed to it. The Court finds that Underwood obstructed justice at his sentencing and directs the probation officer to revise the PSR to apply the two-level enhancement under U.S.S.G. §3C1.1 and to remove the adjustment for acceptance of responsibility.

All that said, this is a hollow victory for the Government. With the above adjustments in place, Underwood's new advisory guidelines, based on an offense level of 43 and a criminal history category V, would be life imprisonment. But Underwood's sentence is capped by a statutory maximum of 30 years based on his guilty plea and thus, this is the outer boundary of the Court's sentencing ability. Nevertheless, the Court believes it is necessary to make the above findings to hold Defendants inclined to perjure themselves and obstruct the Court's proceedings accountable. The next defendant to attempt such actions should be mindful that not all Government victories ring hollow.

## CONCLUSION

Based on the above reasoning, the Defendant's objection to the §2A2.1(b)(2) enhancement is OVERRULED. The Government's request to apply a two-level obstruction of justice enhancement under §3C1.1 and deny the Defendant an acceptance of responsibility reduction is

GRANTED. The probation office is directed to file a revised PSR accounting for these rulings.

The Court will set a sentencing hearing by separate entry.

    SO ORDERED on July 10, 2024

                                          s/ *Holly A. Brady*
                                          CHIEF JUDGE HOLLY A. BRADY
                                          UNITED STATES DISTRICT COURT